EXHIBIT 2

EXECUTION DRAFT

ASSET PURCHASE AGREEMENT

by and among

BAGEL ACQUISITION CORP.,

and

BRUEGGER'S CORPORATION

Dated as of August 6, 2003

TABLE OF CONTENTS

ASSET PURCHASE AGREEMENT ...................................................................1

**ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION** ..........................1
    Section 1.1    Definitions.................................................................1
    Section 1.2    Rules of Construction ....................................................6

**ARTICLE II PURCHASE AND SALE, ASSUMPTION OF CERTAIN LIABILITIES** ...............................................................................7
    Section 2.1    Purchase and Sale of Assets.............................................7
    Section 2.2    Assignment and Assumption of Liabilities.................................9
    Section 2.3    Excluded Assets.........................................................9
    Section 2.4    No Liabilities Assumed.................................................10

**ARTICLE III BASIC TRANSACTION** ...........................................................10
    Section 3.1    Payment of Purchase Price.............................................10
    Section 3.2    Further Assurances....................................................10

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER** ..........................10
    Section 4.1    Seller's Representations and Warranties ...............................10
    Section 4.2    Organization..........................................................10
    Section 4.3    Validity of Agreement .................................................11
    Section 4.4    No Conflicts or Violations.............................................11
    Section 4.5    Title to Assets ......................................................11
    Section 4.6    Approvals and Consents ................................................11

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER** .....................12
    Section 5.1    Organization..........................................................12
    Section 5.2    Authority.............................................................12
    Section 5.3    Consents..............................................................12
    Section 5.4    No Conflicts or Violations ............................................12

**ARTICLE VI ADDITIONAL COVENANTS OF SELLER** ......................................12
    Section 6.1    Consents and Approvals ................................................12
    Section 6.2    Access to Information and the Facilities...............................13
    Section 6.3    Conduct of the Business Pending the Closing ...........................13
    Section 6.4    Notification of Certain Matters; Schedules.............................13
    Section 6.5    Further Assurances....................................................13

**ARTICLE VII COVENANTS OF PURCHASER** .................................................14
    Section 7.1    Further Assurances....................................................14

**ARTICLE VIII CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER** ...................................................................14
    Section 8.1    Warranties True as of Both Present Date and Closing Date; Covenants.............................................................14

Section 8.2    Approvals ...........................................................................14
Section 8.3    Litigation ...........................................................................14
Section 8.4    Closing of CMS Transaction ...........................................14

**ARTICLE IX CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ...............15**
Section 9.1    Warranties True as of Both Present Date and Closing Date;
              Covenants ..........................................................................15
Section 9.2    Approvals ...........................................................................15
Section 9.3    Litigation ...........................................................................15
Section 9.4    Closing of CMS's Transaction ........................................15

**ARTICLE X CLOSING ......................................................................................15**
Section 10.1    Closing ............................................................................15
Section 10.2    Deliveries by Seller .......................................................15
Section 10.3    Deliveries by Purchaser .................................................16
Section 10.4    Form of Instruments ......................................................17

**ARTICLE XI TERMINATION ...........................................................................17**
Section 11.1    Termination ....................................................................17
Section 11.2    Effect of Termination or Breach ...................................17

**ARTICLE XII ADDITIONAL AGREEMENTS; COVENANTS AFTER CLOSING ........17**
Section 12.1    Survival ..........................................................................17
Section 12.2    Employees ......................................................................18
Section 12.3    Seller's Cooperation in Hiring of Employees ...............18
Section 12.4    WARN Act ......................................................................18
Section 12.5    No Beneficiaries other than Purchaser and Seller.........18
Section 12.6    Certain Consents ...........................................................18
Section 12.7    Name Changes ...............................................................19
Section 12.8    Accounts Receivable/Collections ..................................19

**ARTICLE XIII MISCELLANEOUS ....................................................................19**
Section 13.1    Expenses .........................................................................19
Section 13.2    Amendment .....................................................................19
Section 13.3    Notices ............................................................................19
Section 13.4    Waivers ...........................................................................20
Section 13.5    Counterparts and Execution ...........................................20
Section 13.6    Headings .........................................................................20
Section 13.7    Governing Law ...............................................................20
Section 13.8    Binding Nature; Assignment ..........................................20
Section 13.9    Tax Matters .....................................................................21
Section 13.10   Construction ...................................................................21
Section 13.11   Public Announcements ...................................................21
Section 13.12   Entire Understanding .....................................................22
Section 13.13   Closing Actions ..............................................................22
Section 13.14   Limitation on Liability ...................................................22
Section 13.15   Waiver of Right to Jury Trial .........................................22

Section 13.16  Tax Holdback Amounts ...........................................................................22

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of this 6th day of August, 2003, by and among Bagel Acquisition Corp., a Delaware corporation ("Purchaser") and Bruegger's Corporation, a Delaware corporation ("Seller").

NOW, THEREFORE, in consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1     Definitions.  Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Acquired Assets" shall have the meaning set forth in Section 2.1(a) hereof.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.  Notwithstanding anything to the contrary contained in this Agreement, with respect to Seller, any Person whose primary business is not the sale of bagels and other foods and beverage products directly to the public, through retail stores, as a Bruegger's Bagels franchisor or franchisee shall not be an Affiliate of Seller.

"Affiliated Group" means an affiliated group as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law) of which Seller is or has been a member.

"Agreement" means this Asset Purchase Agreement, including all Exhibits and Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"Allocation" shall have the meaning set forth in Section 13.9 hereof.

"Assigned Contracts" means (i) the Assumed Facility Leases and (ii) all the Seller's Contracts except (A) those contracts identified on Schedule 2.1(a)(vi) attached hereto, (B) the Securities Purchase Agreement, the other Financing Agreements, the QDI Subordinated Debt Documents and any other documents pursuant to which Seller has any obligations for borrowed money to Purchaser or its affiliates, and (C) Contracts for the rental or leasing of the Facilities.

"Assigned Plans" means the Employee Benefit Plans set forth on Schedule 2.1(a)(xxv) attached hereto under the heading "Assigned Employee Benefit Plans".

"Assignment and Assumption" shall have the meaning set forth in Section 10.2(a)(iv) hereof.

"Assumed Facility Leases" means all of the Facility leases identified in Schedule 2.1(a)(x) attached hereto, other than those excluded by Purchaser from the Acquired Assets pursuant to Section 2.3(c) hereof.

Closing Date. "Current Net Liabilities" shall also include all "trust fund" taxes due after the closing but relating to the period of time prior to the Closing, and becoming due as a result of audit by a Governmental Authority. "Current Net Liabilities" shall not include any liabilities or obligations to any entities arising from agreements, claims or judgments relating to stores closed by Seller more than sixty (60) days prior to the date of this Agreement.

"Disclosure Schedule" shall have the meaning set forth in Section 4.1 hereof.

"Dollars" or "$" means dollars of the United States of America.

"Employee Benefit Plan" means any Benefit Plan which Seller maintains, contributes to or has any liability or potential liability.

"Environmental Laws" means all federal, state, provincial, local and foreign statutes, Regulations, ordinances, directives and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Substances (including without limitation CERCLA and analogous state laws), each as amended or in effect prior to, on or after Closing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Regulations issued thereunder.

"Excluded Environmental Liabilities" means any Liability or investigatory, corrective or remedial obligation, whenever arising or occurring, arising under Environmental Laws with respect to Seller or any predecessor(s) or Affiliate(s) of Seller, the Business, the Acquired Assets or the Leased Facilities (including without limitation any arising from the on-site or off-site Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of Hazardous Substances) whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any disclosure schedule attached hereto, except to the extent, and in the proportion, that the facts or circumstances underlying any such Liability or obligation were first caused or created after the Closing Date.

"Exhibits" means all the exhibits attached hereto.

"Facilities" means collectively the premises at which Seller operates.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Financing Agreements" shall have the meaning set forth in the Securities Purchase Agreement.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes with respect to which liability or standards

of conduct are imposed under any Environmental Laws, including, without limitation, petroleum and petroleum-related substances, products, by-products and wastes, asbestos, urea formaldehyde and lead-based paint, noise and odors.

"Indebtedness" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include (i) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, (ii) the face amount of all letters of credit issued for the account of such Person, (iii) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens, (iv) capitalized lease obligations, (v) all guarantees and similar obligations of such Person, (vi) all accrued interest, fees and charges in respect of any Indebtedness and (vii) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any Indebtedness.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (ii) trademarks, trademark applications, service marks, service mark applications, trade dress, logos, slogans, trade names, internet domain names and corporate names, together with all goodwill associated therewith, and applications, registrations and renewals in connection therewith, (iii) copyrights, mask works and copyrightable works, and applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential business information (including ideas, research and development, know-how, inventions, formulas, compositions, manufacturing and production processes and techniques, designs, drawings and specifications), (v) proprietary computer software (including but not limited to source code, executable code data, databases and documentation); (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium; and (vii) all other intellectual property.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned by Seller including, without limitation, all raw materials, work in process, semi-finished and finished products or goods, packaging materials, operating supplies, and similar items.

"Leased Facilities" means any land, buildings, structures, improvements, fixtures or other interest in real property which is used or intended to be used by Seller or used or intended to be used in, or otherwise related to, the Business.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including, without limitation, any liability for Taxes.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license or other right, in favor of a Third Party or Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, schedules or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, and including without limitation all claims for Taxes with respect to any pre-closing period.

"Material Adverse Change" or "Material Adverse Effect" means, any event, change, condition or matter that individually or in the aggregate results in or would reasonably be expected to result in a material adverse effect or change in the results of operations or condition (financial or otherwise) or prospects of Seller, the Business or the Acquired Assets.

"Odyssey" shall have the meaning set forth in Section 2.1(a)(xiv) hereof.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any court or Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by Seller in the usual and ordinary course in a manner substantially similar to the manner in which Seller operated the Business prior to the Closing.

"Permits" means all licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like for which consent is obtained.

"Permitted Liens" means easements, covenants, conditions, restrictions, interests, encroachments, and other similar matters on real property, and leasehold estates or otherwise in effect against personalty, that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Promissory Note" means that certain Amended and Restated Junior Subordinated Note, dated as of February 28, 2001, issued by Seller in favor of Quality Dining, Inc. and guaranteed by Seller's Affiliates and subsidiaries.

"Purchase Price" shall have the meaning set forth in Section 3.1 hereof.

"Purchaser" shall have the meaning set forth in the Preamble hereto.

"QDI" means Quality Dining, Inc.

"QDI Subordinated Debt Documents" means that certain (i) Amended and Restated Junior Subordinated Note, dated as of February 28, 2001, issued by Seller in favor of Quality Dining, Inc., in the principal amount of $10,706,667, as amended to date, (ii) Amended and Restated Junior Subordinated Guarantee, dated as of February 28, 2001, by and among QDI and the other parties listed thereto, (iii) Affiliate Subordination Agreement, dated as of February 28, 2001, by and among QDI, the Seller and the other parties listed thereto, and (iv) all other documents executed in connection with clauses (i) through (iii) hereto to which Seller is a party.

"Regulation" means any law, statute, regulation, ruling, rule or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Rehired Employees" means each employee of Seller hired by Purchaser.

"Release" shall have the meaning set forth in CERCLA.

"Release Agreement" shall have the meaning set forth in Section 10.2(a)(v) hereof.

"Schedules" means all the schedules attached hereto.

"Securities Purchase Agreement" means that certain Securities Purchase Agreement, dated as of October 20, 1997, as amended to date, by and between Seller and BancBoston Investment, Inc., a Massachusetts corporation ("BBI"), as the same was assumed by Purchaser pursuant to a Purchase and Sale Agreement dated as of March 12, 2003.

"Seller" shall have the meaning set forth in the Preamble hereto.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not, or (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto.

"Tax Holdback Amount" shall have the meaning set forth in Section 2.1(a) hereof.

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Seller, Purchaser or any of their respective Affiliates.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"WARN Act" shall have the meaning set forth in Section 12.4 hereof.

Section 1.2     Rules of Construction.   Unless the context otherwise clearly indicates, in this Agreement:

    (a)    the singular includes the plural;

    (b)    "includes" and "including" are not limiting;

    (c)    "may not" is prohibitive and not permissive; and

    (d)    "or" is not exclusive.

# ARTICLE II
# PURCHASE AND SALE, ASSUMPTION OF CERTAIN LIABILITIES

Section 2.1     Purchase and Sale of Assets.

(a)     Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller shall sell, contribute, convey, assign, and transfer and shall deliver to Purchaser, free and clear of all Liens (except for the Assumed Obligations and Permitted Liens), and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in Section 3.1, all rights, titles and interests of Seller in and to properties, rights, and assets of every kind and nature owned and leased (where this Agreement provides for the assumption of such lease) by Seller (including indirect and other forms of beneficial ownership) as of the Closing Date (including, without limitation, all assets located on the premises of the Facilities), whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, without limitation, all of the following assets, but excluding Excluded Assets, (all of the assets to be sold, assigned, transferred and delivered to Purchaser hereunder herein called the "Acquired Assets"):

(i)     all of the issued and outstanding shares of BF Holding Corp., a Delaware corporation and a wholly owned subsidiary of Seller ("BF Holding");

(ii)     all cash (except for $100,000 (the "Tax Holdback Amount") which shall be retained by Seller) (including, without limitation, checking account balances, certificates of deposit and other time deposits and petty cash) net of overdrafts and marketable and other securities;

(iii)     all accounts and notes receivables (whether current or noncurrent) and all causes of action specifically pertaining to the collection of the foregoing;

(iv)     all promotional allowances and vendor rebates and similar items;

(v)     all Tax refunds, rebates, credits and similar items payable directly to Seller, relating to any period, or portion of any period, on or prior to the Closing Date;

(vi)     all Intellectual Property, along with all income, royalties, damages and payments due or payable to Seller as of the Closing or thereafter, including, without limitation, damages and payments for past, present or future infringements or misappropriations thereof, the right to sue and recover for past infringements or misappropriations thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments of any such Intellectual Property in Seller's possession or control;

(vii)     all of Seller's rights existing under the Assigned Contracts (to the extent assignable by Seller);

(viii)     all bank accounts, safety deposit boxes, lock boxes and the like and the contents thereof;

(ix)     to the extent assignable, all of Seller's rights existing under the Assumed Facility Leases including, without limitation, all rights to security deposits held pursuant thereto;

(x)     all leasehold improvements and all machinery, equipment (including all transportation and office equipment), fixtures, trade fixtures, computer equipment, telephone systems and furniture owned by Seller wherever located, including, without limitation, all such items which are

located in any building, warehouse, office or other space used, leased, owned or occupied by Seller or used in connection with the Business;

        (xi)     all the Inventory;

        (xii)    all office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind wherever located, including, without limitation, all property of any kind located in any building, office or other space leased, owned or occupied by Seller or in any warehouse where any of Seller's properties and assets may be situated;

        (xiii)   all deposits and advances and prepaid and other current assets;

        (xiv)   all claims, deposits, prepayments, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), including without limitation, all "Company Claims" meaning all claims, actions, causes of action, counterclaims, due, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, damages, extents, executions, rights, losses, rights of recovery, rights to reimbursement, subrogation, indemnification or other payment, costs and expenses, rights of set-off, debts, demands, suits, judgments and all liabilities and any and all other claims of every kind and nature and description whatsoever, known or unknown, both at law and in equity, which Seller, Odyssey Bagels, Inc., a Vermont corporation ("Odyssey"), BF Holding, and Bruegger's Franchise Corporation, a Delaware corporation ("Franchise"), or any of them now have, ever had, or hereafter could have against Michael Dressell, Nordahl Brue, David Austin, Steven Schonberg (individually and in their capacities as current or former shareholders, directors, officers, members, managers, agents or representatives of Seller), and each other person that is a current or former officer, director, shareholder, member, manager, owner, agent, representative or attorney of such entities, and each of their respective heirs, executors, administrators, trustees, successors, assigns or any other person or entity acting by, through, with, or under any of the aforementioned persons or entities, all of which Company Claims are being released by Purchaser and others pursuant to the Release Agreement (delivered in Section 10.2(a)(v) hereof);

        (xv)    the right to receive and retain mail, accounts receivable payments and other communications;

        (xvi)   the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

        (xvii)  all Books and Records;

        (xviii) all advertising, marketing and promotional materials and all other printed or written materials;

        (xix)   all Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies, each to the extent transferable;

        (xx)    all goodwill as a going concern and all other intangible properties;

        (xxi)   all telephone numbers;

        (xxii)  all indemnities;

"Assumed Obligations" shall have the meaning set forth in Section 2.2 hereof.

"Bankruptcy Code" means Title 11 of the United States Code.

"Benefit Plan" means any "employee benefit plan" (including, without limitations, "plans" as defined in ERISA §3(3)), profit sharing, deferred compensation, bonus, stock option, stock purchase, vacation pay, holiday pay, pension, retirement plans, medical and any other form of compensation or benefit plan, program or arrangement of any kind regardless of whether any such plan is written or oral or provided under an employment, collective bargaining or other similar arrangement.

"BF Holding" shall have the meaning set forth in Section 2.1(a)(i) hereof.

"Books and Records" means all records and lists of Seller, including, without limitation, (i) all merchandise, analysis reports, marketing reports and creative material pertaining to the Acquired Assets, the Facilities or the Business, (ii) all records relating to customers, suppliers or personnel of Seller (including, without limitation, customer lists, mailing lists, e-mail address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), (iii) all records relating to all product business and marketing plans of Seller, and (iv) all books, ledgers, files, reports, plans, drawings and operating records of every kind maintained by Seller related to or used in connection with the Business, but excluding the originals of the minute books, stock books and tax returns of Seller, and any personnel or other records which by law are to be kept confidential by Seller.

"Business" means the activities carried on by Seller and any of its Affiliates in connection with the operation of their respective businesses, including without limitation, the activities relating to the sale of bagels and other foods and beverage products (including, without limitation, cream cheeses, coffees, juices, and sandwiches) directly to the public, through retail stores, and as a franchisor or franchisee.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Regulations promulgated thereunder.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" shall have the meaning set forth in Section 10.1 hereof.

"Closing Date" shall have the meaning set forth in Section 10.1 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contract" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which Seller is a party.

"Current Net Liabilities" means, with respect to Seller, (i) all accounts payable of Seller to vendors for goods and services incurred in the Ordinary Course of Business within one hundred eighty (180) days prior to the Closing Date, (ii) all liabilities under any leases, whether or not assumed by Purchaser, covering Leased Facilities actually used and occupied by Seller (or a subtenants of Seller) immediately prior to the Closing Date, arising from such use and occupancy and accrued and unpaid as of the Closing Date, (iii) all liabilities to consumers on account of gift certificates, promotional offers, and coupons, (iv) all sales, meals, payroll and other "trust fund" type taxes accrued and unpaid as of the Closing Date, and (v) all other accrued liabilities incurred in the Ordinary Course of Business arising out of or related to the Assumed Obligations incurred prior to the Closing Date, but not yet paid as of the

(xxiii)   all rights to proceeds under insurance policies;

(xxiv)   the Assigned Plans; and

(xxv)   all security deposits relating to Assigned Contracts.

(b)      All of the Acquired Assets shall be sold, assigned, transferred, conveyed and delivered to Purchaser free and clear of all Liens other than Permitted Liens and Assumed Obligations.

Section 2.2      <u>Assignment and Assumption of Liabilities</u>.  Subject to the terms and conditions set forth in this Agreement, Purchaser shall assume from Seller and thereafter be responsible for the payment, performance or discharge of the following liabilities and obligations of Seller (all such liabilities and obligations herein called the "<u>Assumed Obligations</u>"):

(a)      all obligations under the Assigned Contracts first arising after the Closing;

(b)      all Current Net Liabilities of Seller;

(c)      any obligations associated with the Assigned Plans whether arising before of after the Closing Date;

(d)      any obligations with respect to any unused vacation or sick leave earned and accrued (to the extent not paid) as of the Closing Date, with respect to the Rehired Employees and all other employees terminated prior to the Closing pursuant to <u>Section 12.2(a)</u> hereof which are not rehired by Purchaser ("<u>Terminated Employees</u>");

(e)      any obligations with respect to the Rehired Employees and the Terminated Employees for unpaid wages, salary, and other compensation, incurred, or determined in the future to have been incurred, in the Ordinary Course of Business, and earned and accrued as of the Closing Date;

(f)      any other wage or salary obligations of Seller to any of their current or former employees not otherwise covered in <u>Section 2.2(e)</u>, regardless of when incurred (such as obligations arising under the Fair Labor Standards Act or comparable state law);

(g)      any liabilities described on <u>Schedule 2.2(g)</u> attached hereto;

(h)      any fees and expenses of the Seller's accountant up to, but in no case exceeding, $15,000 for the year ended December 31, 2003, and $3,000 for the year ended December 31, 2004;

(i)      any payments up to, but in no case exceeding, $35,000 in connection with the settlement of claims under any Contracts for the rental or leasing of the facilities not assumed by Purchaser hereunder and pursuant to binding settlement agreements, in form and substance satisfactory to each of Purchaser and Seller, and legal fees and expenses related thereto up to, but in no case exceeding, $2,000; and

(j)      bank fees, up to, but in no case exceeding, $1,500, relating to Seller's bank accounts in existence as of the date hereof.

Section 2.3      <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, the following assets of Seller and/or the Business shall be retained by Seller, as applicable, and are not being sold or assigned to Purchaser hereunder (all of the following are referred to collectively as the "<u>Excluded Assets</u>"):

(a)     income Tax Returns; and

(b)     the equity securities, including. but not limited to. the capital stock of Seller and any of its subsidiaries (including Odyssey), but specifically excluding the equity securities of BF Holding and any of its subsidiaries.

Section 2.4    No Liabilities Assumed.  Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume any obligation of Seller (including without limitation. Excluded Environmental Liabilities), other than the Assumed Obligations and the Permitted Liens.  In furtherance and not in limitation of the foregoing. neither Purchaser nor any of its Affiliates shall assume. and shall not be deemed to have assumed, any Indebtedness. Claim. Liability or other obligation of Seller or any predecessor or Affiliate of Seller whatsoever (other than the Assumed Obligations and the Permitted Liens) (including. without limitation. any claim based on any theory that Purchaser is a successor, transferee or continuation of Seller or the Business).

**ARTICLE III**
**BASIC TRANSACTION**

Section 3.1    Payment of Purchase Price.  The aggregate purchase price (the "Purchase Price") for the Acquired Assets shall be $5,000,000 plus the amount of the Assumed Obligations.  The $5,000,000 portion of the Purchase Price shall be paid by the cancellation of an equivalent amount of debt outstanding on the Closing Date under the loans and other obligations of Seller under the Securities Purchase Agreement. the Financing Agreements and the Promissory Note.  The parties hereto agree that the fair market value of the Acquired Assets is equal to the Purchase Price.

Section 3.2    Further Assurances.  From time to time after the Closing and without further consideration (taking into account Seller's limited resources). (i) Seller. upon the reasonable request of Purchaser. shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby. to vest in Purchaser title to the Acquired Assets transferred hereunder. and to confirm Seller's retention of the Liabilities and obligations set forth in Section 2.4 above. and (ii) Purchaser. upon the reasonable request of Seller. shall execute and deliver such documents and instruments of contract or lease assumption as Seller may reasonably request in order to confirm Purchaser's liability for the Assumed Obligations. the obligations specifically assumed hereunder, or otherwise to more fully consummate the transactions contemplated by this Agreement.  All costs incurred by Seller after the Closing in connection with compliance with the terms of this Section 3.2 shall be paid by Purchaser within ten (10) days of request for payment by Seller to Purchaser.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Section 4.1    Seller's Representations and Warranties.  Seller represents and warrants to Purchaser that the statements contained in this Article IV are correct and complete in all material respects as of the date of this Agreement and as of the Closing Date, except as expressly set forth in the disclosure schedule delivered by Seller to Purchaser on the date hereof (the "Disclosure Schedule").

Section 4.2    Organization.  Seller is a corporation validly organized, validly existing and in good standing under the laws of the state of its incorporation and, except where failure to obtain such qualification could not reasonably be expected to have a Material Adverse Effect, is qualified to do business in every jurisdiction in which it is required to be qualified.

Section 4.3     Validity of Agreement.   Seller has full power to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  As of the Closing Date, the board of directors of Seller shall have duly approved the Transaction Documents to which such Person is a party and shall have duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby. To the knowledge of Seller, no other corporate or organizational proceedings on the part of Seller are necessary to approve and authorize the execution and delivery of the Transaction Documents to which such Person is a party and the consummation of the transactions contemplated thereby. All Transaction Documents to which Seller is a party have been duly executed and delivered by Seller, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Seller after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Seller at or prior to the Closing, and all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Seller, enforceable against Seller in accordance with their terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

Section 4.4     No Conflicts or Violations. To the knowledge of Seller, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Seller do not and shall not (a) conflict with or result in any breach of any of the terms, conditions or provisions of, (b) constitute a default under, (c) result in a violation of, (d) give any Third Party the right to modify, terminate or accelerate any obligation of any Seller under, (e) result in the creation of any Lien upon the Acquired Assets (other than Permitted Liens and the Assumed Obligations) or (f) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority (other than local licensing requirements that may be necessary to operate any store or commissary), under the provisions of the articles of incorporation or by-laws or other constitutive documents of Seller or any indenture, mortgage, lease, loan agreement or other material agreement or instrument to which Seller is bound or affected (other than real estate leases, vendor contracts, equipment leases and vehicle leases), or any law, statute, rule or Regulation to which Seller is subject or any Order to which Seller is subject.

Section 4.5     Title to Assets.   Seller has the power and the right to sell, assign and transfer to Purchaser the Acquired Assets.  To the knowledge of Seller, when duly executed and delivered by Seller to Purchaser at the Closing, this Agreement and the documents contemplated hereby, will effectively vest in Purchaser good and marketable title to the Acquired Assets free and clear of all Liens, except Permitted Liens and the Assumed Obligations. Odyssey has no assets.

Section 4.6     Approvals and Consents.   Except for the authorizations referenced in Section 4.3 above, to the knowledge of Seller, no action, approval, consent or authorization, including, but not limited to, any action, approval, consent or authorization by any Governmental Authority is necessary in order to constitute this Agreement as a valid, binding and enforceable obligation of Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller that the statements contained in this Article V are correct and complete as of the date of this Agreement and as of the Closing Date.

Section 5.1    Organization.  Purchaser is a corporation validly existing and in good standing under the laws of the State of Delaware and has the full power and authority to execute, deliver and perform this Agreement and to consummate all transactions contemplated hereby.

Section 5.2    Authority.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Purchaser and do not and will not violate any of its organizational documents, any applicable Regulation or any contract or Order binding up it.  This Agreement constitutes a valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

Section 5.3    Consents.  No notice to, filing with, authorization of, exemption by, or consent of Governmental Authority is required in order for Purchaser to consummate the transactions contemplated hereby.

Section 5.4    No Conflicts or Violations.  To the knowledge of Purchaser, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Purchaser do not and shall not (a) conflict with or result in any breach of any of the terms, conditions or provisions of, (b) constitute a default under, (c) result in a violation of, (d) give any Third Party the right to modify, terminate or accelerate any obligation of any Purchaser under, or (e) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority, under the provisions of the articles of incorporation or by-laws or other constitutive documents of Purchaser or any indenture, mortgage, lease, loan agreement or other material agreement or instrument to which Purchaser is bound or affected, or any law, statute, rule or Regulation to which Purchaser is subject or any Order to which Purchaser is subject.

## ARTICLE VI
## ADDITIONAL COVENANTS OF SELLER

Section 6.1    Consents and Approvals.  Seller shall cooperate with Purchaser by using commercially reasonable efforts (taking into account Seller's limited resources) (i) to request or consent to request for such consents and approvals, as may be reasonably requested by Purchaser, to facilitate consummation of the purchase and sale of the Acquired Assets and the assignment of the Assumed Obligations, together with any other consents and approvals as may be reasonably requested by Purchaser to facilitate consummation of the transactions contemplated hereby), (ii) to make, or consent to the making of, as reasonably requested by Purchaser, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Seller or any of their Affiliates pursuant to any applicable Regulation in connection with this Agreement and the transactions contemplated hereby and (iii) to make, or consent to the making of, as may be reasonably requested by Purchaser, requests for the transfer of Seller's Permits (including, without limitation, all Environmental Permits) to Purchaser at Closing and, to the extent that one or more of Seller's Permits (including, without limitation, all Environmental Permits) are not transferable, to cooperate with Purchaser in their attempt to obtain replacements therefor.  In the event that certain of Seller's Permits, or any Contract or other license

or agreement necessary for the operation of the Business, are not transferable or replacements therefor are not obtainable on or before the Closing, but such Permits, Contracts or other licenses or agreements are obtainable after the Closing. Seller shall continue to use such commercially reasonable efforts (for a period of up to six months after the Closing) (taking into account Seller's limited resources) in cooperation with Purchaser after the Closing to obtain all such consents and approvals to transfer, or obtain replacements for, such Permits, Contracts or other licenses or agreements, in each case at Purchaser's sole cost and expense.

Section 6.2     <u>Access to Information and the Facilities</u>.  Seller agrees that, prior to the Closing Date, Purchaser, Purchaser's lender, and their respective representatives shall, upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of Seller, have reasonable access during normal business hours to all Facilities and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Seller (including without limitation any environmental audits and investigations or to conduct a physical inventory of the Inventory) (to the extent Seller is itself allowed to conduct such investigations) and such examination of the Books and Records and financial condition of Seller as it reasonably requests and to make extracts and copies to the extent necessary of the Books and Records, provided that no investigation pursuant to this <u>Section 6.2</u> shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement.

Section 6.3     <u>Conduct of the Business Pending the Closing</u>.  Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Purchaser, from the date hereof until the Closing Date, Seller shall (i) conduct the Business in the Ordinary Course of Business (including without respect to the payment of accounts payable of Seller), (ii) use commercially reasonable efforts to preserve intact the Business, to keep available the services of its current employees and agents and to maintain its relations and good will with its suppliers, customers, distributors and any others with whom or with which it has business relations, (iii) to maintain appropriate levels of Inventory (consistent with past practice) and (iv) not take any action materially inconsistent with this Agreement or with the consummation of the Closing.

Section 6.4     <u>Notification of Certain Matters: Schedules</u>.  Seller shall give notice to Purchaser of (i) the occurrence or nonoccurrence of any event that would be likely to cause either (A) any representation or warranty of Seller contained in this Agreement, or in connection with the transactions contemplated hereunder, to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing, or (B) directly or indirectly, any Material Adverse Effect on Seller, or (ii) any material failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder.  Notwithstanding the foregoing, the delivery of any notice pursuant to this <u>Section 6.4</u> shall not be deemed to cure any breach of any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

Section 6.5     <u>Further Assurances</u>.  Seller shall execute such documents and use commercially reasonable efforts to take or cause to be taken all reasonable action and do or cause to be done all reasonable things as may be reasonably requested by Purchaser to facilitate consummation of the transactions contemplated by this Agreement (including, without limitation, to put Purchaser in actual possession and operating control of the Acquired Assets, to effectuate, record or perfect the transfer of the Acquired Assets to Purchaser, to confirm the title of the Acquired Assets in Purchaser, to cooperate with Purchaser's efforts in exercising rights to obtain all consents, approvals and authorizations of Third Parties.  Seller shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in <u>Article VIII</u> of this Agreement.

## ARTICLE VII
## COVENANTS OF PURCHASER

Section 7.1     Further Assurances.  Purchaser shall execute such documents and take such further actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby.  Purchaser shall use its best efforts to fulfill or obtain the fulfillment of the conditions set forth in Article IX of this Agreement.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are, at the option of Purchaser, subject to satisfaction or written waiver of the following conditions precedent on or before the Closing Date.

Section 8.1     Warranties True as of Both Present Date and Closing Date; Covenants.

(a)     Each of the representations and warranties of Seller contained herein shall be true and correct in all material respects on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date) with the same force and effect as though made on and as of the Closing Date, except for those representations and warranties that are qualified by materiality, Material Adverse Effect, or similar phrase, provided, however, this condition shall be deemed satisfied if any failure(s) or breach(es) of such representations and warranties shall not in the aggregate have a Material Adverse Effect.

(b)     Seller shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with Seller on or prior to the Closing Date.

Section 8.2     Approvals.  All authorizations, consents, filings and approvals necessary to permit Seller to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

Section 8.3     Litigation.  No action, suit or other proceedings shall be pending before any Governmental Authority seeking to obtain damages in respect of the transactions contemplated by this Agreement from Purchaser or any of its Affiliates, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction over Seller or Purchaser.

Section 8.4     Closing of CMS Transaction.  All conditions for the closing of the transaction contemplated by the Asset Purchase Agreement between Purchaser and each of Champlain Management Services, Inc., a Delaware corporation ("CMS"), Champlain Leasing, LLC, a Delaware limited liability company ("Leasing"), Norstar Bagel Bakeries, Inc., a Minnesota corporation ("Norstar"), Tarheel Bagels, Inc., a North Carolina corporation ("Tarheel"), Iron City Bagels, Inc., a corporation incorporated in the Commonwealth of Pennsylvania ("Iron City"), Baystate Bagels, Inc., a corporation incorporated in the Commonwealth of Massachusetts ("Baystate Bagels"), Uptown Bagels, Inc., a corporation incorporated in the Commonwealth of Massachusetts ("Uptown Bagels"), and Lethe LLC, a Delaware limited liability company ("Lethe"), dated as of the date hereof, have been satisfied or waived and such transaction shall have been closed contemporaneously with the Closing.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller under this Agreement are, at the option of Seller, subject to the satisfaction or written waiver of the following conditions precedent on or before the Closing Date.

Section 9.1    Warranties True as of Both Present Date and Closing Date; Covenants.

(a)    The representations and warranties of Purchaser contained herein shall be true and correct in all respects on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date in all respects) with the same force and effect as though made by Purchaser on and as of the Closing Date.

(b)    Purchaser shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

Section 9.2    Approvals    All authorizations, consents, filings and approvals necessary (in the opinion of Seller) to permit Purchaser to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance satisfactory to Seller, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. The parties hereto acknowledge that as of the date of the execution of this Agreement, no such approvals have been obtained.

Section 9.3    Litigation    No action, suit or other proceedings shall be pending before any Governmental Authority seeking to obtain damages in respect of the transactions contemplated by this Agreement from Seller or any of its Affiliates, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction over Seller or Purchaser.

Section 9.4    Closing of CMS's Transaction.    All conditions for the closing of the transaction contemplated by the Asset Purchase Agreement between Purchaser and each of CMS, Leasing, Norstar, Tarheel, Iron City, Baystate Bagels, Uptown Bagels and Lethe, dated as of the date hereof, have been satisfied or waived and such transaction shall have been closed contemporaneously with the Closing.

## ARTICLE X
## CLOSING

Section 10.1    Closing.    Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Craig and Macauley Professional Corporation, Federal Reserve Plaza, 600 Atlantic Avenue, Boston, Massachusetts 02210 at 12:00 P.M. Eastern Standard Time no later than the first business day after the date on which the conditions set forth in Article VIII and Article IX have been satisfied or waived; or on such other date as Purchaser and Seller may determine (the "Closing Date"). For avoidance of doubt, the Closing will be deemed to occur at 12:01 a.m. on August 6, 2003.

Section 10.2    Deliveries by Seller.

(a)    At the Closing, Seller shall deliver and assign or procure delivery to Purchaser of:

(i)      physical possession of all of the Acquired Assets under the possession or control of Seller which are capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery;

(ii)      a bill of sale, in the form attached hereto as <u>Exhibit A</u>, conveying in the aggregate all of the owned personal property of Seller included in the Acquired Assets, duly executed by Seller;

(iii)      fully executed intellectual property assignments in the forms attached hereto as <u>Exhibit B</u> each in recordable form to the extent necessary to assign such rights;

(iv)      one or more assignments and assumptions, in the form attached hereto as <u>Exhibit C</u> (collectively, the "<u>Assignment and Assumption</u>"), duly executed by Seller;

(v)      the Release Agreement, in the form attached hereto as <u>Exhibit D</u> (the "<u>Release Agreement</u>"), executed by Seller, Michael Dressell and Nordahl Brue; and

(vi)      Stock Certificate No. 3 representing 100 shares of BF Holding issued to Seller, together with duly executed stock power transferring the shares to Purchaser or an Affiliate of Purchaser.

(b)      At the Closing, Seller shall also delivered to Purchaser all of the following: (i) a certificate signed by Seller in the form of <u>Exhibit E</u> attached hereto, dated the date of the Closing, stating that the conditions specified in <u>Article VIII</u> have been substantially satisfied as of the Closing; (ii) certified copies of the resolutions of Seller's board of directors or other evidence of authority (as the case may be) authorizing and approving the Transaction Documents and the transactions contemplated thereby; and (iii) such other documents or instruments as are required to be delivered at the Closing pursuant to the terms hereof or that Purchaser reasonably requests prior to the Closing Date to effect the transactions contemplated by this Agreement.

Section 10.3      <u>Deliveries by Purchaser</u>.   At the Closing, Purchaser will deliver to Seller the following instruments, duly executed by Purchaser:

(a)      the Assignment and Assumption;

(b)      the Indemnification Letter in favor of Nordahl Brue and Michael Dressell in the form attached hereto as <u>Exhibit F</u>;

(c)      the Indemnification Letter in favor of David Austin in the form attached hereto as <u>Exhibit G</u>;

(d)      the Indemnification Letter in favor of Steven Schonberg in the form attached hereto as <u>Exhibit H</u>;

(e)      the Release Agreement, executed by Purchaser;

(f)      the consent to the Agreement for Release of Seller and others in favor of Nordahl Brue and Michael Dressell, and others, attached hereto as <u>Exhibit I</u> (the "<u>Agreement for Release</u>"); and

(g)      Purchaser shall also delivered to Seller (i) a certificate signed by Purchaser, dated the date of the Closing (in form and substance reasonably satisfactory to Seller) certifying that the

conditions specified in Article IX above have been satisfied as of the Closing; (ii) certified copies of the resolutions of Purchaser's board of directors authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby; and (iii) such other documents or instruments as are required to be delivered by Purchaser at the Closing pursuant to the terms hereof.

Section 10.4    Form of Instruments.  To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Purchaser and Seller.

**ARTICLE XI**
**TERMINATION**

Section 11.1    Termination.  This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written agreement of Purchaser and Seller;

(b)    by either Purchaser or Seller (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other party, which breach is not cured within ten days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(c)    by either Purchaser or Seller if there shall be a Final Order restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby;

(d)    by Purchaser on any day after August 31, 2003 if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Seller in writing), unless the Closing has not occurred due to a material failure of Purchaser to perform or observe its agreement as set forth in this Agreement required to be performed or observed by it on or before the Closing Date;

(e)    by Seller on any day after September 30, 2003 if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Seller in writing), unless the Closing has not occurred due to a material failure of Seller to perform or observe its agreement as set forth in this Agreement required to be performed or observed by it on or before the Closing Date.

Section 11.2    Effect of Termination or Breach.  If the transactions contemplated hereby are not consummated, this Agreement shall become null and void and of no further force and effect, except (i) for this Section 11.2, (ii) for the provisions of Section 13.1, Section 13.7 and Section 13.14 hereof, and (iii) nothing in Section 11.1 or this Section 11.2 shall be deemed to impair the right of any party to compel specific performance by another party of its obligations under this Agreement.

**ARTICLE XII**
**ADDITIONAL AGREEMENTS; COVENANTS AFTER CLOSING**

Section 12.1    Survival.  All representations, warranties, covenants and agreements set forth in this Agreement or in any writing or certificate delivered in connection with this Agreement shall survive the Closing Date and the consummation of the transactions contemplated hereby and shall not be affected

by any examination made for or on behalf of any party, the knowledge of any of such party's officers, directors, stockholders, employees or agents, or the acceptance of any certificate or opinion.

Section 12.2    Employees.  Immediately prior to the Closing, the employment of all of the employees of Seller shall be terminated by Seller, and all such employees shall have the right to apply for employment with Purchaser.  Seller recognizes that Purchaser intends to make offers of employment to substantially all employees of Seller, on terms and conditions of employment that may be different from those provided by Seller, and that it is uncertain how many employees of Seller will accept employment with Purchaser.  Notwithstanding anything herein to the contrary, the terms and conditions of such offers shall be determined by Purchaser in its sole discretion and in accordance with applicable law.

(a)    Nothing contained in this Agreement shall confer upon any Rehired Employee any right with respect to continuance of employment by Purchaser, nor shall anything herein interfere with the right of Purchaser to terminate the employment of any Rehired Employees at any time, with or without notice, or restrict Purchaser, in the exercise of its business judgment in modifying any of the terms or conditions of employment of the Rehired Employees after the Closing.

(b)    As soon as reasonably possible after the Closing Date, Purchaser shall cause each Rehired Employee to be given credit for his or her service with Seller (only to the extent such service is taken into account under Seller's vacation or sick leave policy, program or arrangement) for the purpose of determining such Rehired Employee's vacation and sick leave (on a going-forward basis) in any vacation or sick leave plan, program or arrangement maintained for Purchaser's employees' benefit on or after the Closing Date; provided, however, Purchaser shall not be obligated to pay any cash amounts based on such credit, except on account of acceleration of such benefits due to termination of employment, as may be required by applicable law, or in connection with the normal use of accrued vacation and sick time.

Section 12.3    Seller's Cooperation in Hiring of Employees.  Subject to applicable privacy laws, Seller shall cooperate with Purchaser and shall, permit Purchaser a reasonable period prior to the Closing Date (i) to meet with employees of Seller (including managers and supervisors) at such times as Purchaser shall reasonably request, (ii) to speak with such employees' managers and supervisors (in each case with appropriate authorizations and releases from such employees) who are being considered for employment by Purchaser, (iii) to distribute to such employees of Seller such forms and other documents relating to potential employment by Purchaser after the Closing as Purchaser may reasonably request, and (iv) to permit Purchaser, upon request, to review personnel files and other relevant employment information regarding employees of Seller.

Section 12.4    WARN Act.  In respect of notices and payments relating to events occurring on, prior to, or after the Closing, but related to the transactions contemplated in this Agreement, Purchaser shall be responsible for and assume any liability for and shall indemnify and hold Seller harmless from and against any and all notices, payments, fines or assessments due to any Government Authority, pursuant to the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection therewith (jointly, referred to throughout this Agreement as the "WARN Act").

Section 12.5    No Beneficiaries other than Purchaser and Seller.  No provision of this Agreement shall be construed to confer upon or give to any Person other than Purchaser and Seller and their successors or permitted assigns any rights to remedies hereunder.

Section 12.6    Certain Consents.  If a consent of a Third Party which is required in order to assign any Acquired Asset (or Claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would

adversely affect the ability of Seller to convey its interest in question to Purchaser, Seller will cooperate with Purchaser and use commercially reasonable efforts in any lawful arrangement to provide that Purchaser shall receive the interest of Seller in the benefits of such Acquired Assets. If any consent or waiver is not obtained before the Closing Date and the Closing is nevertheless consummated, Seller agrees to continue to use reasonable efforts, for a period of up to six months, to obtain all such consents as have not been obtained prior to such date (taking into account Seller's limited resources).

Section 12.7    Name Changes.    Immediately after the Closing, Seller shall take all action reasonably necessary to change its name to a name bearing no material resemblance to "Bruegger's". Purchaser agrees and acknowledges that it shall not change its name to the name of Seller prior to the Closing.

Section 12.8    Accounts Receivable/Collections    After the Closing Seller shall permit, and hereby authorizes, Purchaser to collect, in the name of Seller, all accounts receivable constituting part of the Acquired Assets and to endorse with the name of Seller for deposit in Purchaser's account any checks or drafts received in payment thereof. Seller shall promptly deliver to Purchaser any cash, checks or other property that they may receive after the Closing in respect of any accounts receivable or other asset constituting part of the Acquired Assets.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1    Expenses.    Each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby, except that Purchaser shall be responsible for the payment of any taxes or assessments (other than income taxes) relating to the purchase of the Acquired Assets, including without limitation, all transfer taxes, stamp taxes, recording changes, and other similar charges and taxes. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding (i.e., the party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

Section 13.2    Amendment.    This Agreement may not be amended, modified or supplemented except by a written instrument signed by Seller and Purchaser.

Section 13.3    Notices.    Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy, e-mail or other wire transmission (with answer back confirmation of such transmission), (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

To Seller:              Bruegger's Corporation
                        159 Bank Street
                        P.O. Box 1082
                        Burlington, VT 05402
                        Attn:    Steve Schonberg
                        Fax:     (802) 660-4034

with copy to:  Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
Attn:   Christopher Panos
Fax:    (617) 742-1788

To Purchaser, to:  Bagel Acquisition Corp.
5200 Town Center Circle, Suite 470
Boca Raton, FL 33486
Attn:   Marc J. Leder, Rodger R. Krouse and
C. Deryl Couch
Fax:    (561) 394-0540

With copies to:  Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601
Attn:   Douglas C. Gessner
Fax:    (312) 861-2200

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

Section 13.4   Waivers.   The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Seller, in the case of any waiver by Seller, or Purchaser, in the case of any waiver by Purchaser, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

Section 13.5   Counterparts and Execution.   This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

Section 13.6   Headings.   The headings preceding the text of the Articles and Sections of this Agreement and the Exhibits and the Schedules are for convenience only and shall not be deemed part of this Agreement.

Section 13.7   Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (regardless of the laws that might otherwise govern under applicable Delaware principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

Section 13.8   Binding Nature; Assignment.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed); except (i) that Purchaser may freely assign any of its rights and obligations hereunder to any Affiliate or subsidiary of Purchaser (whether wholly owned or otherwise), or to its lender as collateral

security and, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Business or the Acquired Assets; or as otherwise provided in this Agreement. Purchaser may grant a security interest in its rights and interests hereunder to its lenders. Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any rights, remedies, obligations, Claims, or Liabilities under or by reason of this Agreement.

Section 13.9    <u>Tax Matters</u>.  Purchaser and Seller agree and acknowledge that the fair market value of the Acquired Assets is equal to the Purchase Price and that such Purchase Price is allocable to Seller as set forth on <u>Schedule 13.9</u> attached hereto.  Purchaser and Seller agree that Purchaser shall, within the earlier of (i) 120 days after the Closing Date or (ii) 30 days prior to the date by which Seller's federal income Tax Returns must be filed, prepare and deliver to Seller for its consent (which consent shall not be unreasonably withheld, delayed or conditioned) a schedule allocating the Purchase Price (and any other items that are required for federal income tax to be treated as Purchase Price) among the Acquired Assets (such schedule, the "<u>Allocation</u>"): provided that such allocation must be consistent with <u>Schedule 13.9</u> attached hereto.  Purchaser and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Taxing Authority or any other proceeding).  Purchaser and Seller shall cooperate in the filing of any forms (including Form 8594 under section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 13.9</u> shall survive the Closing.

Section 13.10    <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and Regulations promulgated thereunder, unless the context requires otherwise.

Section 13.11    <u>Public Announcements</u>.  Except as required by law, neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned.  Prior to making any public disclosure required by applicable law, the disclosing parties shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same.  Notwithstanding the foregoing, Purchaser shall not be restricted from making any public announcements or issuing any press releases after the Closing, provided such announcements shall not intentionally and materially disparage any of the current or former officers, directors, shareholders, members, managers, owners, agents, representative or attorneys of Seller.  Notwithstanding anything herein to the contrary, Seller and Purchaser agree (on behalf of itself and each Affiliate and Person acting on behalf of it) that each party hereto (and each employee, representative, and other agent of any party hereto) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and Tax structure of the transaction and all materials of any kind (including opinions or other Tax analyses) that are provided to any party hereto or any Person relating to such Tax treatment and Tax structure.  Except to the extent necessary to comply with any applicable federal or state securities laws, Seller and Purchaser agree that the authorization contained in the immediately preceding sentence is not intended to permit disclosure of any other information, including, without limitation, (i) any portion of any materials to the extent not related to the Tax treatment or Tax structure of the transaction, (ii) the identities of participants or potential participants in the transaction; (iii) the existence or status of any negotiations, (iv) any pricing or financial information (except to the extent such pricing or financial

information is related to the Tax treatment or Tax structure of the transaction), or (v) any other term or detail not relevant to the Tax treatment or the Tax structure of the transaction.

Section 13.12    Entire Understanding.  The Transaction Documents set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement, the Exhibits and the Schedules attached hereto supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

Section 13.13    Closing Actions.  All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

Section 13.14    Limitation on Liability.  Purchaser shall not have any cause of action or claim against or recourse to any of the officers, directors, employees, managers, members, stockholders, representatives or agents of Seller, arising from, on account of, with respect to, or in connection with any liability or obligation under this Agreement or any instrument or certificate executed and delivered by Seller in connection with this Agreement, including with respect to or in connection with any representation or warranty made by or on behalf of Seller in this Agreement or in any such instrument or certificate.  Seller shall not have any cause of action or claim against or recourse to any of the officers, directors, employees, managers, members, stockholders, representatives or agents of Purchaser, arising from, on account of, with respect to, or in connection with any liability or obligation under this Agreement or any instrument or certificate executed and delivered by Purchaser in connection with this Agreement, including with respect to or in connection with any representation or warranty made by or on behalf of Purchaser in this Agreement or in any such instrument or certificate.

Section 13.15    Waiver of Right to Jury Trial.  EACH PARTY TO THIS AGREEMENT HEREBY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS AGREEMENT, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

Section 13.16    Tax Holdback Amounts.  Seller agrees and acknowledges that the Tax Holdback Amount (i) shall be placed in a segregated bank account controlled by Seller, (ii) shall not be commingled with any other funds, (iii) shall only be used for the payment of federal and state income taxes, and (iv) on April 15, 2004, any funds remaining in such segregated account shall be immediately paid to Purchaser.

*        *        *        *        *

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

BAGEL ACQUISITION CORP.

By: _____
Name: Kevin Calhoun
Title:  Vice President


**SELLER:**

BRUEGGER'S CORPORATION


By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

BAGEL ACQUISITION CORP.

By: _____
Name:
Title:   Vice President

**SELLER:**

BRUEGGER'S CORPORATION

By: _____
Name:  DAVID R. AUSTIN
Title:  PRESIDENT

*Signature Page to Asset Purchase Agreement*